United States District Court
Eastern District of Michigan
Southern Division

United States of America,

    Plaintiff,                            Case No. 16-20769

    v.                                      Honorable Victoria A. Roberts

D-1 Keeman Bridges,

    Defendant.

_____/

## United States's Sentencing Memorandum

Keeman Bridges kept a credit card lab in his house that he and his fellow gang members used to produce thousands of fraudulent credit cards to fund their illegal activity. Roughly 13,000 stolen credit card accounts have been linked to Bandgang members; Bridges possessed well over 1,000 stolen accounts by himself. The scheme was not discovered until Bridges and other gang members shot a five-year-old girl in a gang-related shooting outside his house. Because of the severity of his actions and his utter lack of remorse, the government asks for a sentence of 186 months, followed by three years of supervised release.

I.      **Factual and Procedural History**

    A.      <u>Offense Conduct</u>

In January 2016, police stopped Bridges and three other Bandgang members on their way to Somerset Mall for a traffic violation. Because of a strong odor of marijuana, as well as Bridges's admission that they had just "smoked it all," police searched the car. Inside, they found 31 counterfeit and unauthorized credit cards, including—inexplicably—an American Express Costco issued to F. Dostal. Bridges had $3,250 in his pockets; the others had roughly $7,000 between the three of them.

A month later, police responded to a shooting outside Bridges's house on Mark Twain in Detroit. Bridges and other Bandgang members had been involved in an altercation with a rival gang, Trust No One (TNO), at a nearby store. A pursuit ensued; Bandgang chased after TNO, and shots were fired. Bandgang lost sight of TNO, but Bridges alerted other Bandgang members at his house nonetheless. When Bridges and the others arrived at his house, another car stopped in the street behind them. The gang members unloaded multiple firearms, including an AK-47, into the car, suspecting it was TNO. But it wasn't;

2

in the chase, the Bandgang vehicle had sideswiped an innocent family. A five-year-old girl was shot in the head because of the incident.

Police arrived to investigate the shooting. Inside the house, they found multiple AK-47s and gang paraphernalia. But they also found a credit card lab in a back bedroom—a laptop, a MSR605 magnetic strip read/write encoder, a Wonder Manual Embosser, and a Dymo label maker.



Twenty-nine fraudulent credit cards were found in the house. A search of the computer revealed 921 stolen credit card accounts, including one that matched the account encoded on a recently produced card found

3

next to the equipment.

Bridges used stolen credit cards to fund his illegal activity. For example, he and other Bandgang members purchased high-priced items with stolen credit card accounts, such as Apple iPads, Microsoft X-Boxes, and Sony PlayStations, and sold them to locations throughout Detroit, including a MetroPCS store in Redford known as I-Exchange for pennies on the dollar. This, in effect, is how he laundered his ill-gotten gains. Bridges received $14,014 in fraudulent proceeds from I-Exchange in 2015 and 2016.

In fact, Bridges had a run-in with police before January 2016 related to credit card fraud. In August 2015, Bridges and three other Bandgang members were arrested in Bath Township for credit card fraud at a local Meijers. Police found 278 fraudulent credit cards and two credit card skimmers on them.

    B.    <u>Procedural History</u>

A grand jury charged Bridges in a seven-count indictment:

1. conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029(a)(3) and (b)(2);

4

2. possession of fifteen or more counterfeit and unauthorized access devices on January 10, 2016, in violation of 18 U.S.C. § 1029(a)(3);

3. possession of fifteen or more counterfeit and unauthorized access devices on February 20, 2016, in violation of 18 U.S.C. § 1029(a)(3);

4. production of a counterfeit access device, in violation of 18 U.S.C. § 1029(a)(1);

5. possession of device-making equipment, in violation of 18 U.S.C. § 1029(a)(4);

6. aggravated identity theft on January 10, 2016, in violation of 18 U.S.C. § 1028A(a)(1); and

7. aggravated identity theft on February 20, 2016, in violation of 18 U.S.C. § 1028A(a)(1).

(R. 25: Superseding Indictment, 59). A jury convicted Bridges of every count except the production charge. (R. 34: Verdict, 117).

Bridges faces a maximum term of imprisonment of 44 years, a fine of $250,000 (per count), a special assessment of $600, and a 3-year term of supervised release.

## II. Sentencing Guideline Calculations and Relevant 3553(a) Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered to impose a sentence "sufficient,

5

but not greater than necessary." Those objectives include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; and (6) the need to avoid unwarranted sentencing disparities (nationwide) among defendants with similar records found guilty of similar conduct. But sentencing starts with the calculation of the Guidelines range to promote the sentencing goals of Congress, namely to "provide certainty and fairness in meeting the purposes of sentencing, while avoiding unwarranted sentencing disparities[.]" *United States v. Booker*, 543 U.S. 220, 264 (2005).

    A.    <u>Section 3553(a) Factors</u>

        i.    <u>Nature of the Offense</u>

This is not just a simple property offense. Credit card fraud is a rampant problem too often ignored by police busy focusing on violent offenses. In fairness, in the hierarchy of crimes, credit card fraud is less egregious than murder, sexual assault, or armed robbery. But Bridges

6

and his Bandgang cohorts exploited this view to their advantage—knowing that police have to focus much of their time on violent crime and drug trafficking, they turned to credit card fraud to avoid the attention of law enforcement. Plus, they knew that, if arrested, the penalty would be significantly lower. Bridges's arrest in Bath Township illustrates this problem. He was arrested with 278 fraudulent credit cards and two credit card skimmers, but the court sentenced him to 90 days in jail. Insouciant, Bridges completely disregarded this entire proceeding; he did not even bother to attend his sentencing in the case. (PSR ¶ 48).

But the problem is that the money generated by their fraud was so large that it attracted attention not from police, but from rival gangs. This led to shootings and other violence as other gangs tried to muscle into the action. In other words, even though credit card fraud itself is not "violent," it causes violence.

    ii.    <u>History and Characteristics of the Defendant</u>

Bridges is 24 years old, and he is already a criminal history category V. He has been convicted of larceny, retail fraud, buying/receiving stolen property, and credit card fraud, but nothing has

7

deterred him. Instead, his criminal activity continues, and it has escalated in severity. Indeed, Bridges was sentenced recently to 15 years in the Michigan Department of Corrections for assault with intent to murder, gang activity, and felony firearms. But he insists he did nothing wrong and downplays the injuries to the five-year-old girl shot because of him.

      iii.    Seriousness of the Offense

Credit card fraud is a serious crime that affects not only the account holders, but all of society. Victims suffer monetary damages and must prove that they did not, in fact, make the charge(s) to get reimbursed. But this process is lengthy, and it often involves temporary damage to their credit scores. Some reports indicate it can take hundreds of hours to undo the damage. *See* Madeleine Scinto, *Beware: Credit Card Fraud Will Pound Your Score*, BUSINESS INSIDER, Nov. 1, 2011, http://www.businessinsider.com/beware-credit-card-fraud-will-pound-your-credit-score-2011-11. In fact, F. Dostal, one of the victims of Bridges's conduct, testified at trial about the severe effect this crime had on his credit and how it prevented him from obtaining a debt consolidation loan.

8

The cost to society is enormous. There is over $11 billion in credit card fraud each year. Retailers and banks spend billions each year to combat credit card fraud, and yet there is still widespread fraud in the United States. Ultimately, these costs are borne by everyone in the form of higher prices and increased fees. Adam Dolby, *Collateral Damage: The Effect of Card Fraud on Small Businesses, Customers and the Economy*, HUFFINGTON POST, April 24, 2014, http://www.huffingtonpost.com/adam-dolby/collateral-damage-the-eff_b_5206822.html

Locally, Michigan leads the nation in identity theft. Per capita, 175.6 people out of every 100,000 in the state will be the victim of identity theft. And this number is on the rise. There were 399,225 identity theft crimes in 2016—up nearly 60% over the last decade. *Michigan is #1 . . . in identity theft*, WLNS, April 14, 2017, http://wlns.com/2017/04/14/michigan-is-1-in-identity-theft/

    iv.    <u>Promoting Respect for the Law and Providing Just Punishment</u>

Bridges has no respect for the law. He showed this when he did not show for his sentencing in 29th Circuit Court; he showed this when

he failed to appear—twice—in his buying/receiving stolen property case in 17th District Court; and he showed this on the last day of trial when he refused to change his clothes. (PSR ¶¶ 43, 48).

In terms of just punishment, the United States believes this case warrants a sentence at the top of the guidelines range—186 months. Nationally, district courts vary from the applicable Guidelines range using the § 3553(a) factors in only 25% of fraud cases.[1] Typically, judges vary from the guidelines only when the loss amount is high, such as in white collar securities fraud cases. But that is not this case. This is a case of credit card fraud and an example of pure greed. A variance from the 186-month guideline range not only fails to justly punish Bridges, it also results in an unwarranted disparity in sentencing.

    v.   Need for Deterrence

All of the above factors also implicate the need for a sentence to provide sufficient deterrence. Bridges is young, but he shows no respect

---

[1] United States Sentencing Commission, Sentences Relative to the Guideline Range by Selected Primary Offense Category (Fiscal Year 2016) 19, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2016/6c16.pdf.

10

for the law or concern about his actions. This case provides an opportunity to deter him from future criminal conduct, and a minimal sentence will reinforce the idea that he can commit this type of crime without consequence. Plus, if Bridges is not stringently punished, it fails to deter his other Bandgang cohorts under investigation, who will view the federal court system as laughable like they already do the state system. The government does not object to the sentence running concurrently with his 15-year term in the Michigan Department of Corrections; the key is a stringent sentence so that others like Bridges see the substantial penalties that can result from such conduct.

      vi. <u>Protecting the Public</u>

In addition to the need to deter Bridges, a sentence of 186 months will protect the public from his future illegal conduct. Clearly, his many, many convictions prior to 2016 did not deter him. A 186-month term of custody will ensure the safety of the community while Bridges is in prison.

## III. Conclusion

For these reasons, the United States recommends a 186-month sentence of imprisonment, followed by three years of supervised release.

                                      Respectfully submitted,

                                      Daniel L. Lemisch
                                      Acting United States Attorney

                                      <u>/s/ Shane Cralle</u>
                                      Shane Cralle
                                      Assistant U.S. Attorney
                                      211 W. Fort Street, Suite 2001
                                      Detroit, MI 48226
                                      Phone: (313) 226-9551
                                      shane.cralle@usdoj.gov

Dated: August 21, 2017

## Certificate of Service

I certify that on August 21, 2017, I electronically filed this Sentencing Memorandum, with the Clerk of the Court using the ECF system, which will send notification of such filing to the following attorney of the defendant:

Lillian Diallo
lilliandiallo@sbcglobal.net

/s/ Shane Cralle
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9551
Fax: (313) 226-5892
Email: Shane.Cralle@usdoj.gov